IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

        Plaintiff,

   vs.                              **Case No. 09-40026-01/02-RDR**

VINCENT J. RIDLEY and
JESSICA D. GEARTZ,

        Defendants.

_____

<u>**MEMORANDUM AND ORDER**</u>

Defendants Vincent Ridley and Jessica Geartz are charged with possession with intent to distribute approximately 25 grams of crack cocaine.  This case is now before the court upon defendants' motions to suppress.  The court has conducted an evidentiary hearing upon the motions and is prepared to rule.

The motions to suppress concern a search which occurred at 2513 S.W. Burnett in Topeka, Kansas on March 9, 2009.  The search was conducted with a search warrant.  Two police officers obtained the information which supplied the basis for the search warrant by entering the residence and seeing contraband in plain view.  Defendants argue that the officers' entry into and movement inside the residence exceeded the authority of the occupant to consent to their entry as well as

the scope of any consent granted for their entry.

<u>Testimony</u>

Victor Riggin is a ten-year veteran of the Topeka Police Department.  He has four years experience as a narcotics officer.  He testified that he received a complaint over the phone of drug traffic at 2513 S.W. Burnett in Topeka, Kansas. The complaint indicated that there was a large amount of vehicle traffic at the address, like a "McDonald's drive-thru."  A day or two later, Riggin and another experienced narcotics officer, Robert Razo, decided to engage in a "knock and talk" at the address.  Riggin approached the side door of the residence.  As he did he passed a trash collection area and smelled a strong odor of grape cigars.  He testified that such cigars are commonly used for blunts.  Riggin knocked on the side door and a voice inside told him to come in.  Riggin knocked again and the voice inside asked "who is it?"  Riggin did not answer but knocked a third time.  This time a female, Virginia Ridley ("Ms. Ridley"), opened the door slightly and peeked out.  Riggin identified himself and Razo, and asked to come inside.  Both officers wore clothes which plainly identified them as police officers.  Ms. Ridley opened the door further and permitted the officers to enter the house.

The officers passed through the doorway into a small kitchen. Riggin testified that he was not comfortable speaking in the kitchen and that his training to avoid unnecessarily dangerous situations (perhaps involving kitchen knives) caused him to ask Ms. Ridley if they could talk elsewhere.  Riggin stated that Ms. Ridley then led the officers from the kitchen through a somewhat narrow hallway to the living room.  Once in the living room, the officers noticed marijuana and a marijuana pipe in plain view.  Ms. Ridley told the officers, according to Riggin, that she was not responsible for what was in the house and that she was just watching the house and the children inside while her daughter-in-law and son were in Kansas City.  Officer Riggin asked for consent to search the house.  Ms. Ridley denied consent to search.  So, the officers secured the house and applied for a search warrant.  In the meantime, Ms. Ridley was permitted to gather the children and leave the house.

Riggin testified that he did not know who lived in the house before he did the "knock and talk" and that he did not do any prior research to find out.  He stated that Ms. Ridley appeared extremely nervous, but not intoxicated.  She was an older woman and did not appear to be a threat to the officers.

Riggin did not see any knives in the kitchen when he asked to speak elsewhere in the house.  He testified that he did not control where Ms. Ridley led the officers when they left the kitchen.

Officer Razo's testimony was consistent with the testimony of Riggin, except he did not hear Riggin request that they talk someplace other than the kitchen.  Razo also testified that when Ms. Ridley was asked for consent to search she said that she was just there to babysit and did not think she had the authority to consent to a search.

Ms. Ridley testified that she was at the house to clean and care for the children.  She stated that she was aware when she opened the door that she was speaking with police officers and that she permitted them to come inside when Riggin requested to do so.  She said she felt nervous or "spooked." The officers did not demand that she talk to them or demand that they be allowed in the living room.  She stated that Riggin suggested that they speak somewhere other than the kitchen and gestured in the direction of the hallway.  Ms. Ridley testified that she didn't have to go to the living room and that she had a choice, but immediately thereafter testified that she felt "forced" to go to the living room.

4

She said that she felt as if she did not have a choice because Riggin was a police officer.  She was afraid that Riggin would take her "downtown" or put his hands on her if she did not cooperate.  She admitted, however, that the officers did not threaten her or put their hands on her.  They asked for permission to enter the house.

Prior to the above-mentioned testimony, the court asked for proof regarding defendant Vincent Ridley's expectation of privacy in the house.  Defendant Ridley testified that he did not live at the address, did not have a key to the house, and did not come inside the house without permission.  He estimated that he spent the night at the house perhaps once a month.

Expectation of Privacy

A motion to suppress may be made only by a person aggrieved by the unlawful search and seizure.  3A Wright, King & Klein, FEDERAL PRACTICE & PROCEDURE:  Criminal 3rd § 674 at p. 370 (2004).  An "aggrieved" person is one whose own Fourth Amendment right to privacy has been violated by the unlawful search.  See U.S. v. Jarvi, 537 F.3d 1256, 1259 (10th Cir. 2008).  Thus, to bring a motion to suppress evidence obtained from 2513 S.W. Burnett in Topeka, Kansas, defendants must

demonstrate that they had a subjective expectation of privacy in the house at that address and that society would accept that expectation as reasonable.   U.S. v. Rhiger, 315 F.3d 1283, 1285 (10th Cir.) cert. denied, 540 U.S. 836 (2003) (quoting, U.S. v. Higgins, 282 F.3d 1261, 1270 (10th Cir. 2002)).  Here, the government does not contest that defendant Geartz had a reasonable expectation of privacy in the house. The record indicates that her children were living in the house and that she was living there, too.   Therefore, the court shall accept that defendant Geartz has a privacy interest which provides an adequate foundation for bringing a motion to suppress.  On the other hand, defendant Ridley has not demonstrated a reasonable privacy interest in the house. He was not present at the time of the search.  He does not claim a possessory interest in the house.  According to the evidence presented during the hearing, he was an infrequent social guest at the residence and did not have that status at the time of the search.  Therefore, defendant Ridley's motion to suppress must be denied.

Authority to consent to enter and move within the premises

The court shall first address whether Ms. Ridley had the

authority to consent to the entry.  Most of the case law on this subject concerns consent to search as opposed to consent to enter.  The general principles appear the same in each instance.  "[G]reat significance" is attached to "widely shared social expectations, which are naturally enough influenced by the law of property, but not controlled by its rules."  Georgia v. Randolph, 547 U.S. 103, 111 (2006).  In Randolph, the social expectations attached to a caregiver in a home who answers the door were described as follows:

> When someone comes to the door of a domestic dwelling with a baby at her hip, as Mrs. Graff did [in U.S. v. Matlock, 415 U.S. 164 (1974)], she shows that she belongs there, and that fact standing alone is enough to tell a law enforcement officer or any other visitor that if she occupies the place along with others, she probably lives there subject to the assumption tenants usually make about their common authority when they share quarters.  They understand that any one of them may admit visitors, with the consequence that a guest obnoxious to one may nevertheless be admitted in his absence by another. . . .

Id. at 112.  In other words, a person in charge of children who occupies a residence is generally considered to have some authority to consent to police action.  Whether the scope of the consent authority extends merely to entry or also to a search within a home, is affected as well by common understanding or widely shared social expectations.  As an

7

example:

> "[A] child of eight might well be considered to have
> the power to consent to the police crossing the
> threshold into that part of the house where any
> caller, such as a pollster or salesman might well be
> admitted," 4 LaFave § 8.4(c), at 207 (4th ed. 2004),
> but no one would reasonably expect such a child to
> be in a position to authorize anyone to rummage
> through his parents' bedroom.

Id.

The court concludes that Ms. Ridley had the authority to consent to the officers' entry into and movement within the residence.  Ms. Ridley was the only responsible adult in the residence and was caring for children when the officers arrived.  Before she came to the door to see who was knocking, she twice said "come in," indicating that she had broad authority to allow people into the home.  She either had been or was going to be the sole responsible adult in a house with children for a significant period of time because she suggested that the regular occupants of the house had gone to Kansas City.  This suggests that she had broad access, at the very least, to the children's room and the common areas of the residence.  When she left the house, she took the children with her, indicating that she had wide responsibilities and trust as a caretaker.  Finally, Ms. Ridley appears to be the mother-in-law of defendant Geartz, and this relationship

suggests that she had broader control over the residence than, for instance, a babysitter who was unrelated to defendant Geartz.  See United States v. Rith, 164 F.3d 1323, 1330 (10th Cir.) cert. denied, 528 U.S. 827 (1999) (suggesting a normative inquiry into whether the relationship between the residents and third-party occupiers creates a presumption of control over the property for most purposes by the third party).

The case of Davis v. United States, 327 F.2d 301 (9th Cir. 1964) is relevant here.  In Davis, the defendant's eight-year-old daughter granted police consent to enter her home to speak to the defendant.  When the police entered the house, they saw marijuana in plain view.  The Ninth Circuit concluded that the daughter's opening the door and invitation to enter were not unexpected or unauthorized acts and, therefore, the officer's discovery of marijuana in plain view was permissible evidence.

Voluntariness of consent

Consent must be freely and voluntarily given. Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973). Voluntariness is determined upon a review of the totality of the circumstances.  Id. at 227.  The Tenth Circuit requires: 1) that there be clear and positive testimony that consent was

unequivocal and specific and freely given; and 2) that the government prove that consent was given without duress or coercion, express or implied. U.S. v. Guerrero, 472 F.3d 784, 789 (10th Cir. 2007) (quoting U.S. v. Butler, 966 F.2d 559, 562 (10th Cir. 1992)). The court believes that both requirements have been met in this case.

The court finds that there was clear and positive testimony proving that Ms. Ridley gave unequivocal, specific and voluntary consent to the entry of Officers Riggin and Razo into the house. It has also been proven that the consent was given without duress or coercion. The officers acted calmly. They did not use force or threaten force in any fashion. They did not touch Ms. Ridley or attempt to intimidate her. Eventually, Ms. Ridley told the officers that she would not consent to a search of the residence. Therefore, although Ms. Ridley was nervous, the court is convinced that she was acting voluntarily when she permitted Officer Riggin and Officer Razo to enter the house.

The court acknowledges the testimony regarding Ms. Ridley's subjective feelings regarding what might happen if she denied consent. We are not persuaded by this testimony that Ms. Ridley's consent was involuntary. These feelings did

not stop Ms. Ridley from denying consent to search. In addition, the Tenth Circuit has held that a person's attitude or subjective fears regarding police authority should not be given significant weight in determining whether consent was voluntarily given. <u>U.S. v. Iribe</u>, 11 F.3d 1553, 1557 (10th Cir. 1993); <u>U.S. v. Zapata</u>, 997 F.3d 751, 759 (10th Cir. 1993).

<u>Consent to enter the living room</u>

Defendants contend that Ms. Ridley did not voluntarily consent to Officer Riggin and Officer Razo entering the living room where they saw the contraband. We reject this contention. Officer Riggin's testimony was credible to the court. Ms. Ridley's testimony was contradictory. She first stated that she knew she had a choice and that she did not have to permit the officers to enter the living room. Then she backed away from that testimony. Officer Riggin's concern for safety is credible to the court and leads the court to believe that Ms. Ridley voluntarily led the way to the living room at Officer Riggin's request. No coercion or duress was applied to obtain Ms. Ridley's consent. It was freely and voluntarily given.

<u>Conclusion</u>

The court concludes that Ms. Ridley had authority to

permit Officer Riggin and Officer Razo into the residence and the living room at 2513 S.W. Burnett in Topeka, Kansas.  She freely and voluntarily did so.  Therefore, there was no constitutional violation by the officers which tainted the information used as a basis for the search warrant for the residence.  The court further concludes that defendant Ridley has not established that he had a privacy interest in the residence.  For these reasons, the motions to suppress shall be denied.

   **IT IS SO ORDERED.**

   Dated this 13th day of July, 2009 at Topeka, Kansas.


                    s/Richard D. Rogers
                    United States District Judge

12